

**FILED**
Mar 24 2020, 9:37 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Karl L. Mulvaney
Gregory J. Duncan
Nana Quay-Smith
Bingham Greenebaum Doll, LLP
Indianapolis, Indiana

Gerald H. McGlone
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE

Mark D. Hassler
Jacob H. Miller
Hassler Kondras Miller, LLP
Terre Haute, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Revocable Trust Agreement Created by the Settlor, Anil Kumar Sarkar | March 24, 2020 |
| Dipa Sarkar, | Court of Appeals Case No. 19A-TR-1814 |
| *Appellant-Petitioner,* | Appeal from the Vigo Superior Court |
| v. | The Honorable Sarah K. Mullican, Judge |
| Anuradha ("Mili") Sarkar Naugle, | Trial Court Cause No. 84D03-1503-TR-1438 |
| *Appellee-Respondent.* | |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Petitioner, Dipa Sarkar (Dipa), appeals the trial court's findings of facts and conclusions thereon in favor of Appellee-Respondent, Anuradha Sarkar Naugle (Mili), concluding that the revocable trust was not created in contemplation of death and for the purpose of defeating Dipa's spousal elective share.

We affirm.

# ISSUE

Dipa presents this court with one issue on appeal, which we restate as: Whether a surviving spouse can satisfy her election to take against the will of her deceased husband when he transferred the majority of his assets into a revocable trust.

# FACTS AND PROCEDURAL HISTORY

Dipa is the surviving spouse of Anil Sarkar (Anil), who died on February 24, 2015. Dipa and Anil were married in 1958 in India, where they attended medical school, and remained married for fifty-six years until Anil's death. At the time of their marriage, Anil was a widower with two children from his previous marriage, Ashoke Sarkar (Ashoke) and Mili. Dipa and Anil had one child together, Rumu Sarkar (Rumu). They immigrated to the United States to complete their medical residencies in pathology and became permanent residents in 1961. Dipa and Anil brought Rumu with them to the United States, while Ashoke and Mili remained in India for many years.

[5] In 1969, Dipa became the laboratory director at Mary Sherman Hospital in Terre Haute, Indiana, while Anil became the laboratory director at Clay County Hospital. Anil created the Sarkar Medical Corporation, which received the couple's salaries and provided a profit-sharing plan. Both Dipa and Anil retired in 1990 due to Anil's poor health.

[6] Beginning in the 1970's and continuing throughout their marriage, Dipa and Anil kept separate bank accounts, pension plan accounts, and investment accounts. Anil spent a big part of his income on his extended family in India. He took care of his parents and their farm; he built homes for his eight living siblings as well as a school and latrines for the village, in addition to gifts and supplies. Anil also financially supported Ashoke and Mili as adults, while Dipa paid for Rumu's expenses and education.

[7] In 1992, after they both retired, Dipa retained attorney Keith Lyman (Attorney Lyman) to create a revocable trust of which she was the settlor and primary beneficiary during her life. The primary purpose of the trust was "to provide for the management of the settlor's assets, both presently and during any future period of disability; being a preferred alternative to guardianship proceedings and a simplified means of accomplishing both lifetime and death transfers of those assets." (Exh. Vol. V, p. 173). The trust agreement provided that Dipa was the primary beneficiary during her life, and for the administration of the trust for her benefit during any period of incapacitation. Dipa's trust agreement specified that upon her death, the trustee would distribute to Anil "the minimum amount necessary to reduce the federal estate tax payable as a result

of my death to the least amount possible," and "I acknowledge that is it my intent that the amount to be distributed to my spouse shall not exceed an amount which will provide for zero tax upon my death." (Exh. Vol. V, pp. 178-79). Rumu was the sole primary beneficiary of the residue of the trust corpus following any transfer to Anil necessary to reduce estate tax liability. Dipa's trust agreement also included that Anil, as successor trustee, would not have the power to appoint any trust property for his benefit, and he was prohibited from exercising discretion in his own favor.

[8] In 1993, at Dipa's insistence, Anil also sought Attorney Lyman's services, and on August 23, 1993, Anil executed the Anil Kumar Sarkar Revocable Trust Agreement, which was nearly identical in all respects to Dipa's, except that Mili was named as the residuary beneficiary. Both Dipa and Anil transferred their respective investment accounts to their respective trusts, and on March 4, 1994, both executed their own beneficiary designations naming their respective trusts as beneficiaries of their respective interests in the Sarkar Medical Corporation Profit-Sharing Trust and Pension Plan. By amendment on August 23, 1996, Dipa and Anil both executed beneficiary designations for their respective interests in the Sarkar Medical Corporation Profit-Sharing Trust and Pension Plan naming the other as the primary beneficiary, with their respective trusts as secondary beneficiary.

[9] On October 23, 1996, Attorney Lyman wrote a letter, addressed to both Anil and Dipa, in which he restated the couple's respective goals and objectives, Anil's being to provide for Mili and Dipa's being to provide for Rumu. The

letter acknowledged a recent discussion with Anil and Dipa about "the advantages of designating each spouse as the primary beneficiary on your IRA's" but stated that, "[b]oth of you have indicated to me that you do not wish to leave your respective IRA accounts to each other," and that "[e]ach of you are generally uncomfortable with designating the spouse as the primary beneficiary of the IRA proceeds because you would no longer maintain control over the ultimate beneficiaries of each such IRA account after your respective deaths." (Exh. Vol. VI, p. 42). Additionally, Attorney Lyman included a summary of a surviving spouse's right to elect to take against a deceased spouse's will. After describing this right, Attorney Lyman advised,

> Indiana law has determined that the spouse's statutory election can be made only against the probate assets of the spouse who died first. It has been ruled that this right of election does not extend to trust assets. Whether that would continue to be the law of the State of Indiana remains to be seen. It is therefore possible that the second spouse to die could make a claim against the first to die's IRA proceeds or possibly the trust. Therefore if you are willing to assume that risk, then you may proceed without any additional documentation.

(Exh. Vol. VI, p. 44). Lyman continued that if Anil and Dipa wished to foreclose this possibility, another document would be required, but reiterated, "[a]s I mentioned earlier, it is my opinion that this right of election would not extend to the IRA's or trust property." (Exh. Vol. VI, p. 45). Neither Dipa nor Anil executed any agreement to waive their spousal right to an elective share. On November 1, 1996, Dipa and Anil both amended their respective trust

agreements, opting for distributions to each other's respective non-spouse beneficiaries and acknowledging that they chose to leave nothing to each other.

[10] Dipa continued to make amendments to her trust agreement with the aid of Attorney Lyman. By letter, dated March 11, 1998, Attorney Lyman advised Dipa of the benefits of purchasing life insurance and gifting, stating that

> [w]e have discussed the tax advantages of naming your husband as primary beneficiary on those retirement accounts. You have informed me, however, that you would prefer not to name him as primary beneficiary because he has sufficient retirement assets in his own name and you have a desire to provide for your daughter primarily with retirement accounts, and other beneficiaries with your non-retirement accounts currently in your revocable trust.

(Exh. Vol. VI, pp. 212-14). On July 15, 1998, Attorney Lyman informed Dipa that he could no longer represent either spouse. Referencing his letter of March 11, 1998, Attorney Lyman noted a potential conflict of interest between Dipa and Anil, as Dipa indicated to him that she did not wish for him to discuss her estate planning with Anil.

[11] On March 31, 1997, Anil restated his entire trust agreement (Trust or Trust Agreement). The Trust Agreement provided that "because my spouse, [Dipa], has more assets than I have and will not need my money or property to support herself, I choose to leave nothing to her." (Exh. Vol. VI, p. 110). In accordance with this expressed intention, the Trust Agreement devised $250,000 to Rumu, $100,000 to each of Mili's two sons, $10,000 to Anil's

brother Sekhar Sarkar, and $5,000 to Ashoke, with the remainder of the corpus to Mili.

[12] Anil amended his Trust Agreement seven times, with the seventh and final Trust amendment occurring on March 14, 2014. From the original Trust Agreement through the fourth amendment, Anil made no provision for distribution of any Trust assets to Dipa, stating, [b]ecause my spouse, [Dipa], has more assets than I have and will not need my money or property to support herself, I choose to leave nothing to her." (Exh. Vol. VI, p. 110). Beginning with the fifth amendment through the final amendment, Anil provided for Dipa to receive $50,000. Specifically, in the final amendment, he named Mili as successor trustee and directed her to distribute $250,000 to Rumu, $30,000 to Ashoke, $50,000 to Sekhar, and $50,000 to Dipa if she survived him by thirty days. The remainder of the Trust assets were to be distributed to Mili, or if she was deceased, to her descendants per stirpes.

[13] The Trust Agreement was funded by two investment accounts owned by Anil. One account, titled in the name of the Trust and held by Anil as trustee, consisted of stocks and bonds and was valued at $924,635 at the time of Anil's death. The second account that funded the Trust Agreement was the IRA valued at $1,007,614. Shortly before he died, Anil also had his monthly social security payments diverted from his checking account into the Trust Agreement.

[14]     In 2000 and again in 2003, Dipa signed consent forms of persons other than herself as beneficiaries of Anil's Individual Retirement Account (IRA). On August 23, 2007, Anil and Dipa both signed nearly identical sets of documents for the transfer of their respective trust accounts and IRAs to Morgan Stanley, and both designated their respective trust accounts as beneficiaries of their respective IRAs. Neither spouse signed the other's designation where indicated for spousal consent required in community property states. Both Anil and Dipa signed a joint letter to their joint financial adviser, directing payment from their respective IRAs to their respective trusts, and on August 2, 2010, Dipa received a mailing from Morgan Stanley which included detailed information about Dipa's and Anil's investment plan and amounts invested.

[15]     On January 20, 2014, thirteen months before his passing, Anil executed a simple pour-over will that transferred his remaining probate assets, if any, to the Trust Agreement. Anil appointed Rumu as his personal representative and directed that she use his probate estate to pay all of his debts, medical expenses, funeral expenses, estate administration expenses, and "all inheritance, estate, and like taxes . . . payable by reason of [his] death and in connection with any property, whether passing under this will or otherwise" without reimbursement from any person. (Exh. Vol. II, pp. 16-18). Anil made no provision for Dipa in his will other than to leave her his tangible personal property, such as his clothes and household goods.

[16]     Shortly after Anil's death on February 24, 2015, Rumu filed a petition to probate the will. The will was admitted to probate and Rumu was appointed as

personal representative the following day. On March 10, 2015, Dipa filed a petition to docket the Trust and for relief, challenging the validity of Anil's Trust and the propriety of Anil's decision to divert the majority of his assets to the Trust in an attempt to disinherit her. Dipa subsequently filed an election to take against the will under Indiana Code section 29-1-3-1, which Mili contested as untimely. Mili moved for summary judgment on Dipa's petition, which was granted by the trial court. Consequently, Dipa timely appealed.

[17] On appeal, we concluded that Dipa had made a timely election to take against Anil's will and that, therefore, Dipa was allowed to amend her petition to more specifically allege her elective share claim against the assets of Anil's trust. *See Matter of Sarkar*, 84 N.E.3d 666, 675 (Ind. Ct. App. 2017) (*Sarkar I*). Finding genuine issues of material fact with respect to Dipa's ability to satisfy her elective share with the assets of Anil's Trust, we remanded to the trial court for further proceedings.

[18] On remand and after extensive discovery, the trial court conducted a trial over four separate days, beginning July 6, 2018. Prior to trial, the parties stipulated that Dipa suffered from an irreversible degenerative neurological condition and lacked the capacity to testify. An agreement was reached that Dipa's testimony at trial would be limited to the deposition testimony she gave in August 2015. On May 24, 2019, the trial court entered its findings of fact and conclusions thereon, issuing judgment in favor of Mili. Recognizing that Anil's Trust assets were not subject to Dipa's elective share, the trial court concluded, in pertinent part, that:

10. [] Anil's [T]rust was established in 1993, twenty-two (22) years prior to his death, for the purpose of obtaining assistance in personal and business affairs as well as disposing of his property at death. Anil had check writing authority on his [T]rust and could amend or modify it at any time. Both Anil and Dipa were present with [Attorney Lyman] when the original estate planning advice was provided. The couple agreed to dispose of their assets separately and not to each other. Dipa was aware of Anil's [T]rust and its provisions because it was identical to hers. Further, Anil and Dipa used a joint financial adviser, [], who testified that the couple's investments were identical. [The financial advisor] testified that Anil and Dipa came together to her office to execute financial documents and that each was aware of the others IRA and trust.

12. The [c]ourt finds no evidence that Anil's intent in creating the [T]rust was to frustrate Dipa's right to a statutory elective share. The [c]ourt further finds that Anil's [T]rust was not created in contemplation of his death and is therefore not testamentary. Therefore, the [c]ourt finds that Anil's [T]rust assets are not subject to Dipa's statutory elective share.

(Appellant's App. Vol. II, pp. 39-40).

Dipa now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

The trial court entered special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A). These special findings should contain all the facts necessary for recovery by the party in whose favor the conclusions of law are found and should contain a statement of the ultimate facts from which the trial

court determines the legal rights of the parties to the action. *Seslar v. Seslar*, 569 N.E.2d 380, 383 (Ind. Ct. App. 1980). Special findings provide the parties and the reviewing court with the theory on which the trial court decided the case so that the right of review may be effectively preserved. *See Display Fixtures Co. v. R.L. Hatcher, Inc.*, 438 N.E.2d 26, 30 (Ind. Ct. App. 1982). Where a party challenges special findings and conclusions, our standard of review is two-tiered. First, we determine whether the evidence supports the findings, and second whether the findings support the judgment. *Dunnewind v. Cook*, 697 N.E.2d 485, 487 (Ind. Ct. App. 1998). The trial court's findings and conclusions will be set aside only if they are clearly erroneous. *Id.* Findings of fact are clearly erroneous if the record lacks any evidence or reasonable inferences to support them. *Id.* In reviewing the trial court's entry of special findings, we neither reweigh the evidence nor reassess the credibility of the witnesses. *Id.* Rather, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. *Id.* This court may affirm the judgment on any legal theory supported by the findings, but only if the alternative theory has been briefed by all parties and is consistent with all of the trial court's findings and inferences drawn therefrom. *Mitchell v. Mitchell*, 695 N.E.2d 920, 923-24 (Ind. 1998).

## II. *Elective Share of Surviving Spouse*

[21] Dipa contends that Anil's transfer of assets to his Trust Agreement signaled a clear intent to disown her and divest her of her right to take against the will. As Anil's Trust was created in contemplation of death and with a clear intent to

disinherit her, Dipa maintains the trial court erred to deny her right to take her statutory elective share from the Trust's assets.

[22] It is well-established that in Indiana, surviving spouses hold certain statutory rights upon the death of their spouse. *Boetsma v. Boetsma*, 768 N.E.2d 1016, 1020 (Ind. Ct. App. 2002), *trans. denied*. As such, pursuant to Indiana Code section 29-1-3-1, the surviving spouse of an individual who dies testate may elect to take against the will if the surviving spouse is not satisfied with the provision made for him or her in the will. *In re Estate of Weitzman*, 724 N.E.2d 1120, 1122 (Ind. Ct App. 2000). Thus, our statutory law protects a spouse from being disinherited by providing a spousal allowance from their deceased spouse's estate and the ability of the surviving spouse to take against the provisions of the deceased spouse's will, thereby ensuring a certain degree of future support. *Brown v. Guardianship of Brown*, 775 N.E.2d 1164, 1167 (Ind. Ct. App. 2002). A surviving spouse may only waive his or her right to take against the will by a written agreement after full disclosure of the nature and extent of that right. I.C. § 29-1-3-6. No such written agreement was executed in this case.

[23] In determining the estate of the deceased spouse for the purpose of computing the amount due to the spouse electing to take against the will, the court is to consider only such property as would have passed under the laws of descent and distribution. *In re Estate of Weitzman*, 724 N.E.2d at 1123. A valid *inter vivos* trust does not pass under the laws of descent and distribution and thus does not become part of the decedent's probate estate. *Dunnewind*, 697 N.E.2d

at 488. In *In re Walz*, 423 N.E.2d 729, 732 (Ind. Ct. App. 1981), we described the effect of an *inter vivos* trust as follows:

> The *inter vivos* trust is a unique legal entity. Through its use, the settlor may transfer property to a trustee reserving for the life of the settlor the beneficial use of the property with the remainder to designated beneficiaries. Although the settlor enjoys the beneficial use of the trust property until his death that trust property is not subject to the administration of his estate. That is, the trust property is not in the decedent-settlor's estate. The Probate Code, which controls the distribution of the decedent's property, does not control the *inter vivos* distributions of property.

[24] However, in recent years, Indiana jurisprudence started recognizing a spouse's ability to enforce his or her elective share claim against the deceased spouse's non-probate property under certain circumstances. Through *Leazenby v. Clinton Co. Bank & Trust*, 355 N.E.2d 861 (Ind. Ct. App. 1976) and its progeny, Indiana precedents have shaped the conditions in which a surviving spouse may reach beyond the will into a valid *inter vivos* trust to satisfy the statutory elective right when faced with insufficient probate assets.

[25] In *Leazenby*, we held that an *inter vivos* trust established by a wife successfully transferred her property and removed it from the estate, thereby in effect defeating her husband's interest in his statutory elective share. *Id*. at 866. We reached this conclusion by recognizing that a transfer solely for the purpose of defeating the spouse's statutory share is void. However, we found that wife and husband, a subsequent childless spouse, had maintained separate properties and that wife had gone to the bank to establish a trust for the purpose of obtaining

aid in handling her affairs three years prior to her death. *Id*. at 862. The trust agreement reserved to the wife the right to income from the trust for life, the right to control the actions of the trustee, and the right to revoke. *Id*. Husband was granted the right to reside in the settlor's former house for six months following her death. *Id*. As time went on, wife was confined to a nursing home and her separate funds were used to pay for her care. *Id*. The *Leazenby* court observed that it was obvious husband was aware of this situation and had acceded to it. *Id*. at 866. There was no indication that it was the settlor's intent to use the device of a trust to defeat her husband's statutory share in her estate; rather, she had merely conveyed a portion of her estate during her lifetime, which she had every right to do. *See id*. at 866-67.

[26] Approximately ten years later, in *Walker v. Lawson*, 526 N.E.2d 968, 969 (Ind. 1988), our supreme court was faced with the question of whether it was malpractice for an attorney to draft a will, and not a trust, for a client who had recently learned of a fatal diagnosis and who "had come [to the attorney] for the stated purpose of depriving her husband of any interest in her estate." Acknowledging both the rule set forth in *Leazenby* and the holding of *Crawfordsville Trust Co. v. Ramsey*, 100 N.E.1049 (Ind. Ct. App. 1913), in which the court upheld the trial court's invalidation of assignments of stock and bonds by a spouse who made the assignments knowing he would soon die and for the sole purpose of defeating his spouse's elective rights with respect to the assigned property, the *Walker* court ruled that neither the conveyance of her land to a trust naming her children as beneficiaries nor a conveyance of that land to

herself and her children with survivorship rights would have been effective against the surviving spouse's elective rights. *Id.*

[27] Again after a ten-year interval, this court decided *Dunnewind*, 697 N.E.2d at 487, where we found in favor of the surviving spouse's right of election. Here, the settlor executed a will in 1976 in which she left all her assets to her children from a prior marriage. *Id.* at 487. After discovering she was terminally ill in 1995, she created a trust under which her husband would receive a life estate in the marital residence and household goods, as well as a predetermined sum of money, with the remainder to go to settlor's children. *Id.* The trust made no provision for payment of income to the settlor. Based on the evidence presented, the *Dunnewind* court opined that "there was no showing that the trust was executed to assist the [settlor] with business or financial affairs," and held that "the evidence presented at the hearing supports the trial court's findings that [the settlor] executed the trust in contemplation of her impending death and did so to defeat [husband's] statutory share . . . Given such circumstances, the trust fails to defeat the spouse's share given the law announced in *Crawfordsville* and *Walker*." *Id.* at 487, 490. We also noted that the trust had a "testamentary character," because the trust agreement did not give the settlor a life interest in the trust property, yet the trustee, the settlor's daughter, permitted her to reside in the residential property and paid to her the trust's income until the settlor's death. *Id.* The court found that neither the settlor nor the beneficiaries intended the transfer to the trust to take effect until the settlor's death, similar to the finding in *Crawfordsville*. *Id.* at 490.

[28]     Finally, in *In re Estate of Weitzman*, 724 N.E.2d 1120, 1121 (Ind. Ct. App. 2000), both husband and wife had children from a prior marriage. Before the marriage, Wife refused to sign a prenuptial agreement that would have waived her elective share rights to her husband's estate. *Id*. Four years into the marriage, husband executed a revocable living trust, benefiting his children and appointing the bank as trustee while husband retained the power to direct all trust investment and receive the income from the trust. *Id*. Within three years, husband transferred significant assets into the trust. *Id*. Wife knew that husband had a trust; however, there was no evidence she was aware of the provisions of the trust. *Id*. at 1121-22. Husband died six years after creating the trust and several years after funding it. *Id*. After describing the nature and effect of an *inter vivos* trust and restating the general rule in *Leazenby* and the policy grounds upon which that decision was reached, the *Weitzman* court stated, "[t]here is one pertinent exception to the rules and policies we relied on in *Leazenby*. When a testator executes a trust in contemplation of his impending death and does so in order to defeat the surviving spouse's statutory share, the trust will be considered testamentary in nature and will not defeat the spouse's share." *Id*. at 1123. Finding that the facts did not negate the possibility that husband's intent was to defeat the surviving spouse's elective share, we reversed the trial court's summary judgment in favor of husband and remanded for trial. *Id*. at 1125.

[29]     Accordingly, based on these precedents, the determinative issue before us is whether the trial court properly found that Anil did not establish the Trust in

contemplation of his death and with the purpose of defeating Dipa's statutory share. As we noted in *Sarkar I*, "[t]he question of whether a testator has established a trust in contemplation of death and with the intent of defeating his surviving spouse's statutory share is a fact-sensitive inquiry." *Sarkar I*, at 677.

### A. *In Contemplation of Death*

[30] Although Anil created the Trust in 1993, he restated the instrument in its entirety on March 31, 1997. Anil passed away eighteen years later, on February 24, 2015. When a trust agreement is restated, the reader should "forget all prior documents and just look at this document, because these are the trust provisions that are currently in effect." *Bender, 1 Living Trusts, Forms and Practice*, § 9.07 (2019). However, to analyze and determine Anil's actions and intent, we will need to take into account the circumstances surrounding the prior version of the Trust.

[31] Anil's purpose of his restated Trust indicated that he pursued "a simplified means of accomplishing both lifetime and death transfers" of his assets, with assistance in his personal and business affairs. (Exh. Vol. VI, p. 109). Unlike *Dunnewind* where there was no showing that the trust was executed to assist in financial affairs, Anil's Trust, created after he retired, was initially utilized as part of his estate and income tax planning efforts, and it later held and managed the trust assets, with Anil having check writing authority. *See Dunnewind*, 697 N.E.2d at 487. Appointing himself as trustee, Anil retained all trust property under his control, "with no restrictions on the transferability of such property."

(Exh. Vol. VI, p. 112). He amended the Trust seven times, with the final amendment executed approximately one year prior to his death.

[32] Although the record is documented with Anil's extensive cardiac health problems, contrary to *Dunnewind* and *Walker*, there is no evidence indicating that Anil expected to die anytime soon after the effectuation of the Trust instrument. *See Dunnewind*, 697 N.E.2d at 487 (trust was created after becoming terminally ill); *Walker*, 526 N.E.2d at 969 (trust was created after settlor learned of fatal diagnosis). Rather, it was not until 2013, or twenty years after creating the initial trust, that Anil voiced his concerns to Rumu of an impending death. There is no evidence in the record that throughout the lifetime of the Trust—original or restated with amendments—Anil's position with respect to the purpose of the Trust and identification of the remainder beneficiaries ever changed. Likewise, there is no evidence that any amendment was effectuated in expectation of death. Rather, the amendments only fluctuated the amount left to each remainder beneficiary, leading us to conclude that internal family relationships played a significant role in the creation of the amendments and not any belief that Anil was to die shortly.

[33] As in *Weitzman*, significant assets were transferred into the trust throughout the years, with the most recent transfer being Anil's social security payments. *See In re Weitzman,* 724 N.E.2d at 1122. However given the fact that the Trust had been assembling Anil's assets since 1993—the investment account and IRA had been transferred to the Trust by 1998—and that the social security payments only amount to a minor addition to the complete Trust corpus, we cannot

conclude that this transfer alone would change our conclusion that Anil's Trust and corresponding transfers of assets were not created in contemplation of death.

### B. *Intention to Disinherit*

[34] While the Trust's express stated purpose was to assist Anil with his business and financial affairs, at the same time, Anil also acknowledged in the instrument that "[b]ecause my spouse, [Dipa], has more assets than I have and will not need my money or property to support herself, I choose to leave nothing to her." (Exh. Vol. VI, p. 110). Attorney Lyman testified extensively about Anil and Dipa's corresponding estate planning goal to leave their significant assets to their non-spousal beneficiaries. Nevertheless, this explicit intent appears to be contradicted beginning with the fifth amendment through the final amendment, where Anil directed "the trustee to distribute, to [his] spouse, [Dipa], the sum of Fifth [sic] Thousand Dollars ($50,000.00), outright and free of trust, if she survives me by thirty (30) days[.]" (Exh. Vol. II, p. 21).

[35] Throughout their married life, Anil and Dipa kept their financial affairs divided with separate bank accounts, pension plan accounts, and investment accounts. Although Anil and Dipa initially retained Attorney Lyman to create their individual trust accounts and to advise them on the legal ramifications thereof, by July 1998, a potential conflict of interest ceased Attorney Lyman's representation and Anil and Dipa consulted with their individual attorneys, but were still advised by the same financial advisor at Morgan Stanley. However,

throughout the time that Attorney Lyman represented Anil and Dipa, they met with him together on most, if not all occasions, and discussed their respective trust provisions in the presence of each other. Attorney Lyman testified that Anil and Dipa had an agreement "to dispos[e] of their assets to their respective beneficiaries and not to each other." (Exh. Vol. V, p. 49). After designating a non-spousal remainder beneficiary of the trust corpus at the creation of their respective trusts, both Anil and Dipa amended their trust agreements on November 1, 1996, again opting for distributions to non-spousal beneficiaries and acknowledging that they chose to leave nothing to each other.

[36] In 2007, Anil and Dipa signed a joint letter to their joint financial advisor directing payment from their respective IRAs to their respective trusts. On August 2, 2010, Dipa received a mailing from Morgan Stanley, which included detailed information about both Dipa's and Anil's respective investment plan, IRA, and IRA beneficiary. They continued to meet jointly with their financial advisor and they reviewed "both client account assets at the same time." (Exh. Vol. VIII, p. 15).

[37] Accordingly, unlike *Weitzman*, where the wife knew that husband had a trust but was unfamiliar with its provisions, here, there is overwhelming evidence from which the trial court could have reasonably inferred that Anil and Dipa were aware of the other spouse's trust provisions and estate planning. *See In re Weitzman*, 724 N.E.2d at 1121. In fact, Anil and Dipa commenced their trust creation with the same attorney and although they later retained individual counsel, they were advised by the same financial planner, and had joint

meetings in which their respective assets were discussed. Anil transferred his assets to the Trust with Dipa's full knowledge while at the same time she transferred her own assets to a nearly identical trust. As there is "no conclusive evidence that there was a secreting of the real ownership of the property, or that [Dipa] did not know and fully approve of the trust agreement," we conclude that Anil did not create the Trust with the intent to disinherit Dipa. *See Leazenby*, 355 N.E.2d at 866. Consequently, as there is substantial evidence that Anil did not create the Trust in contemplation of death and with the intent to disinherit Dipa, we affirm the trial court's decision to deny Dipa's claim to satisfy her spousal elective share from the Trust corpus.

# CONCLUSION

[38] Based on the foregoing, we hold that Dipa cannot satisfy her statutory election to take against the will with the assets in her deceased husband's *inter vivos* Trust.

[39] Affirmed.

[40] Baker, J. and Brown, J. concur